RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
SEAN A. MCCLELLAND
Assistant Federal Public Defender
District of Columbia Bar No. 90001362
CHRISTOPHER P. FREY
Assistant Federal Public Defender
Nevada State Bar No. 10589
200 South Virginia Street, Suite 340
Reno, Nevada 89501
(775) 321-8451/Phone
(702) 388-6261/Fax
Sean_McClelland@fd.org
Chris_Frey@fd.org

Attorneys for GREGORY W. PHEASANT

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:21-CR-024-RCJ-CLB |
| Plaintiff, | **MOTION TO DISMISS**[1] |
| v. | [Hearing Requested] |
| GREGORY W. PHEASANT, | |
| Defendant. | |

## I.     INTRODUCTION

Congress has given the federal Bureau of Land Management virtually unchecked power to create—and then enforce—its own criminal code. In doing so, Congress provided no intelligible principle to guide BLM decision-making; the agency can enact any criminal laws it thinks are "necessary to implement the provisions of [the Federal Land Policy and Management Act of 1976] with respect to the management, use, and protection of the public lands." 43 U.S.C. § 1733(a). That is an unconstitutional delegation of legislative power.

---

[1] This motion is timely filed. ECF No. 53.

The indictment here charges violations of regulations promulgated under that unconstitutional delegation. Worse, by prohibiting a "risk," one of those regulations is also unconstitutionally vague and overbroad. And the indictment suffers from other, more commonplace, defects as well. The assault charge and regulatory charges both fail to allege necessary elements and fail to provide sufficient factual specificity.

The indictment should be dismissed.

## II.    BACKGROUND[2]

Nearly two-thirds of Nevada is managed by the BLM.[3] The agency controls 48 million acres of land in the state, including land in every one of the state's sixteen counties:



---

[2] The background facts discussed below are drawn in part from the discovery the government has thus far provided and are presented only for purposes of this motion. Mr. Pheasant reserves the right to challenge and supplement these alleged facts with his own investigation and with any information that may be discovered at any evidentiary hearing held in this matter.

[3] *See* BLM, BLM NEVADA HISTORY, https://www.blm.gov/about/history/history-by-region/nevada (last accessed Mar. 17, 2023) ("Today, Nevada contains forty-eight million acres

BLM, NEVADA PUBLIC ROOM, available at https://www.blm.gov/media/public-room/nevada (last accessed Mar. 17, 2023).

On that land, the BLM exercises virtually unfettered discretion to create its own laws—including its own crimes. In particular, the Secretary of the Interior (which administers the BLM) can issue any "regulations necessary to implement the provisions of [the Federal Land Policy and Management Act of 1976] with respect to the management, use, and protection of the public lands." 43 U.S.C. § 1733(a). Violating those regulations can lead to prison terms of up to one year, thousand-dollar fines, or both. *Id.*

The BLM has exercised that authority to erect a range of civil and criminal regulations in the lands it manages. Those rules govern everything from how long individuals can camp at a particular spot, 43 C.F.R. § 8365.1-2(a); to what kind of seatbelts individuals must wear, *id.* § 8365.1-3(b)(1); to whether saddle horses have the right-of-way over off-road vehicles, *id.* § 8341.1(g). And those are just the generally-applicable regulations; the BLM's self-created regulations further permit BLM State Directors to issue (at their own discretion) their own "supplementary rules" within their respective jurisdictions. 43 C.F.R. § 8365.1-6. Under that authority, Nevada's BLM State Director has, for instance, banned shooting firearms in particular areas near Winnemucca and Carson City, 79 Fed. Reg. 9,267-01(4)(a) (Feb. 14, 2014); 65 Fed. Reg. 69781-03(4)(e) (Nov. 20, 2000); picking up rocks in certain parts of Humboldt, Pershing, and Washoe Counties, 73 Fed. Reg. 39,027-02(2) (July 8, 2008); and having hay, straw, or mulch that is not certified as weed-free on any BLM-managed lands in the state, 65 Fed. Reg. 54544-01(a)(1) (Sept. 8, 2000).

Moon Rocks is one such location subject to BLM lawmaking. Approximately 45 minutes north of Reno and with a unique set of granite rock formations (which give it its name), it is a popular destination for motocross riders and other off-road enthusiasts. Historically, the

---

of public land, amounting to 63 percent of the state, managed by the Bureau of Land Management.").

BLM administered the area with a light hand. But, citing concerns about Moon Rocks's increased popularity, the BLM implemented a new management and enforcement plan in April 2021.[4] Among other measures, that plan pledged to "target specific public health and safety and resource concerns" and to "increase regulatory oversight" of those who frequented the area.[5]

On May 28, 2021, shortly after that new BLM plan took effect, Mr. Pheasant was detained by BLM officers while motocross riding in Moon Rocks. Per the officers' reports, one officer, Ranger Yost, observed a number of "motorcyclists" riding "without rear taillights," one of whom yelled profanities at Ranger Yost. Exhibit A at USAO 3; Exhibit B at USAO 6. Ranger Yost identified the yelling rider as "wearing a neon green color shirt, black and white helmet with red stripes on his pants" (the officer would later identify this rider as Mr. Pheasant). Exhibit A at USAO 3. Ranger Yost informed his colleagues of the motorcyclists, *id.*, and his colleagues positioned their vehicles "along the road" to stop the one who had yelled the profanities, Exhibit B at USAO 6.

Shortly thereafter, a second officer, Ranger Sarcinella, saw "a group of dirt bike riders . . . with no taillights" and attempted to stop them. *Id.* One of the riders—which Ranger Sarcinella identified as wearing "a dark-blue and yellow jersey with red stripes"—slowed down "as if yielding." *Id.* As Ranger Sarcinella approached, the rider stated a profanity and braked his bike. *Id.* The rider then "twisted his throttle rapidly," causing the bike's rear wheel to "break

---

[4] *See* BLM, FINAL ENVIRONMENTAL ASSESSMENT: HUNGRY VALLEY OFF-HIGHWAY VEHICLE AREA (MOON ROCKS) PUBLIC HEALTH & SAFETY IMPROVEMENTS, DECISION RECORD (Apr. 2021), available at https://eplanning.blm.gov/public_projects/2011194/200470342/20037928/250044125/MoonRocks%20Decision%20Record_Signed.pdf; *see also* Steve Timko, *BLM Considering Safety And Environmental Rules For Moon Rocks*, KOLO (Dec. 27, 2020) (summarizing BLM position on changes), available at https://www.kolotv.com/2020/12/27/blm-considering-safety-and-environmental-rules-for-moon-rocks/.

[5] BLM, PUBLIC HEALTH & SAFETY IMPROVEMENTS at 3–4.

traction" and "spray [Ranger Sarcinella's] face with rocks and dirt." *Id.* at USAO 7. The rider rode away without Ranger Sarcinella following. *Id.*

Later, Ranger Yost detained Mr. Pheasant. Exhibit A at USAO 3. Ranger Yost "stuck [his] baton through the spokes" of Mr. Pheasant's bike "so he could not . . . flee from the area." *Id.* Ranger Yost told Mr. Pheasant he was being detained. *Id.* Ranger Yost then told Mr. Pheasant that he was in violation of BLM regulations, which require off-road vehicles to have a taillight. *See id.* Mr. Pheasant requested he be issued a citation, which he eventually was. *Id.*

Mr. Pheasant was ultimately indicted on three counts in this Court. ECF No. 1. Count 1 comes from the United States Code: assault on a federal officer in violation of 18 U.S.C. § 111(a)(1), (b). Counts 2 and 3 come from BLM-issued criminal regulations: creating a risk to another by resisting issuance of citation or arrest in violation of 43 C.F.R. § 8365.1-4(a)(4) (Count 2) and failure to use a taillight at night in violation of 43 C.F.R. § 8341.1(f)(5), (h) (Count 3).

Mr. Pheasant now moves to dismiss the indictment in its entirety.[6]

## III.    ARGUMENT

### A.    The BLM-Created Charges Are Unconstitutional.

Counts 2 and 3 (the two alleged violations of BLM-created regulations) should be dismissed on constitutional grounds. The at-issue regulations were created by an unconstitutional delegation of legislative power to the Secretary of the Interior. And the resisting-citation charge (Count 2) is further premised on an unconstitutionally-vague and unconstitutionally-overbroad "risk" regulation. Both Count 2 and Count 3 therefore warrant dismissal.

---

[6] To the extent the Court permits the indictment to proceed, either in whole or in part, Mr. Pheasant is also contemporaneously filing a motion to suppress evidence collected in violation of his Fourth Amendment rights.

### 1.      The BLM Cannot Create Crimes.

The two BLM-created regulations Mr. Pheasant is charged with violating are the products of an unconstitutional delegation of legislative power. They were both issued under a statute that provides no intelligible principle to guide BLM lawmaking, and under which the BLM has promulgated criminal laws of the sort at issue here. Those two charges should therefore be dismissed.

The Constitution delineates—and separates—legislative and executive powers. Congress creates the laws. U.S. CONST. art. I (giving Congress "[a]ll legislative Powers"). The executive branch merely enforces them. U.S. CONST. art. II (giving the President "[t]he executive Power").

That separation has teeth. By assigning the lawmaking power to Congress, the Constitution erected "a bar on its further delegation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality op.). So, while Congress can give agencies limited discretion to "implement and enforce the laws," *id.*, Congress cannot "transfer" legislative power to an agency in the process, *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 530 (1935). The line separating the constitutional from the unconstitutional in this setting is whether Congress has provided an "intelligible principle" by which an agency is supposed to act. *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). If Congress has not provided such a principle, then the statute—and any regulation promulgated under it—is unconstitutional. *E.g.*, *Jarkesy v. SEC*, 34 F.4th 446, 459–63 (5th Cir. 2022) (concluding that a statute that delegates the choice between bringing enforcement proceedings in federal court or in agency proceedings to the SEC was unconstitutional).

This doctrine has particular force in the criminal context. Letting federal agencies create the very crimes they are tasked with enforcing effectively turns them into "the expositor, executor, and interpreter of criminal laws." *Aposhian v. Wilkinson*, 989 F.3d 890, 900 (10th Cir.

6

2021) (Tymkovich, J., dissenting) (emphasis omitted). Doing so poses the same risks as "hand[ing] responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges"; both moves threaten to "erod[e] the people's ability to oversee the creation of laws they are expected to abide." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). And so, in the words of Justice Gorsuch (joined by Chief Justice Roberts and Justice Thomas), judges should be particularly averse to "endow[ing] the nation's chief prosecutor with the power to write his own criminal code." *Gundy v. United States*, 139 S. Ct. 2116, 2131 (2019) (Gorsuch, J., dissenting).

The doctrinal requirements are simple. A statute constitutes an unconstitutional delegation if: (1) the statute "delegate[s] power to the agency that would be legislative power but-for an intelligible principle to guide its use"; and (2) the statute does not provide any such "intelligible principle." *Jarkesy*, 34 F.4th at 461; *accord United States v. Melgar-Diaz*, 2 F.4th 1263, 1267 (9th Cir. 2021) (identifying similar considerations). The statute here does both. It and the regulations it purports to authorize are unconstitutional.

As to the first prong, the statute and accompanying regulations at issue here are quintessentially legislative. A government action fits that bill if it has "the purpose and effect of altering the legal rights, duties and relations of persons . . . outside the legislative branch." *Jarkesy*, 34 F.4th at 461 (quoting *INS v. Chadha*, 462 U.S. 919, 952 (1983)). And the BLM creating its own crimes does just that: such regulatory action "alter[s]" what those on BLM land can and cannot do. *Id.* That ability is therefore legislative.

As to the second prong, the authorizing statute here provides no "intelligible principle" to guide the BLM's lawmaking authority. The relevant statute purports to let the BLM (by way of the Secretary of the Interior) issue any regulations "necessary to implement the provisions of [the Federal Land Policy and Management Act of 1976] with respect to the management,

7

1  use, and protection of the public lands." 43 U.S.C. § 1733(a).[7] That authority is doubly open-

2  ended. The BLM can determine what is "necessary." *Id.* And it can then write whatever

3  regulations—including crimes—it thinks might accomplish those ends. *Id.* Nothing in the

4  statute cabins either decision in any meaningful way.

5       In fact, the statute seems to provide no guidance at all on the sort of regulations the

6  BLM can issue. *See Jarkesy*, 34 F.4th at 462 ("If the intelligible principle standard means

7  anything, it must mean that a total absence of guidance is impermissible under the

8  Constitution."). By the language of the statute, the BLM can apparently create (and in fact has

9  created) its own housing policies, traffic laws, firearms regulations, mining rules, agriculture

10 certifications, and—most critically here—criminal code. *See* 43 U.S.C. § 1733(a) (allowing any

11 regulation "necessary to implement" the BLM's "management" responsibilities); *see also* 43

12 C.F.R. § 8365.1-2(a); *id.* § 8365.1-3(b)(1); *id.* § 8341.1(g); 79 Fed. Reg. 9,267-01(4)(a) (Feb.

13 14, 2014); 65 Fed. Reg. 69781-03(4)(e) (Nov. 20, 2000); 73 Fed. Reg. 39,027-02(2) (July 8,

14 2008); 65 Fed. Reg. 54544-01(a)(1) (Sept. 8, 2000); *see generally* 43 U.S.C. § 1701(a)(1)–(13)

15 (general policy declaration that would appear consistent with all these regulations and more).

16 If the BLM believes all those regulations are consistent with the statute, the statute would appear

17 to have no limiting principle, let alone an "intelligible" one.

18      But even if that were not so, the delegation here would still, at a minimum, provide less

19 of an "intelligible principle" than statutes previously held to be unconstitutional. Those statutes

20 confined agency discretion to a particular type of conduct (business-to-business competition,

---

22  [7] There are other statutes that authorize the Secretary of the Interior to promulgate
23  similar regulations, but 43 U.S.C. § 1733(a) is the only one that allows for criminal enforcement
    of the sort at issue here—and is therefore the only one at play in this case. *United States v.*
24  *Henderson*, 243 F.3d 1168, 1171 (9th Cir. 2001) (identifying § 1733(a) as the relevant statute
    in an analogous criminal case involving similar regulations); *cf.* 16 U.S.C. § 470aaa-1
25  (authorizing regulations dealing with paleontological resources); *id.* § 670(g) (same for wildlife,
    fish, and game conservation and rehabilitation programs); *id.* § 1241 (same for trails); *id.* §
26  1281 (same for the general administration of river systems); 43 U.S.C. § 315(a) (same for the
    "protection, administration, regulation and improvement" of grazing districts).

8

petroleum transportation, where to file a lawsuit, etc.). The statute here provides no such limits; it purports to authorize the BLM to regulate anything it wants, however it wants, on BLM land.

In *Schechter Poultry*, for example, the Supreme Court concluded that a statute which authorized an agency to set rules for "fair competition" between businesses failed to provide an intelligible principle guiding agency enforcement. 295 U.S. at 541–42. Such language, the Court concluded, provided "no standards for any trade, industry or activity" and gave "virtually unfettered" "discretion [to] the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country." *Id*. at 542.

*Panama Refining Co. v. Ryan* is similar. There, the Supreme Court concluded that § 9(c) of the National Industrial Recovery Act—which purported to allow the executive branch to set how much oil could be transported between states—violated the nondelegation doctrine. The full text of that section was nearly as open-ended as the BLM's criminal lawmaking authority here; it provided that:

> (c) The President is authorized to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any state law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State. Any violation of any order of the President issued under the provisions of this subsection shall be punishable by fine of not to exceed $1,000, or imprisonment for not to exceed six months, or both.

293 U.S. 388, 406 (1935). Such language, the Court concluded, "establish[ed] no cr[i]terion to govern the President's course"—the language did not "qualify the President's authority" based on any particular set of facts or "require any finding by the President as a condition of his action." *Id.* at 415. It, in effect, let the executive branch make its own laws about petroleum transportation, with their own criminal penalties. And so, if it "were held valid," the Court

opined, "it would be idle to pretend that anything would be left of limitations upon the power of the Congress to delegate its law-making function." *Id.* at 430.

Recent opinions from courts of appeals across the country have reached similar conclusions on similar facts. In *Jarkesy*, for instance, the Fifth Circuit concluded that a statute permitting an agency to choose whether to bring securities fraud actions in federal court or in internal agency proceedings was an unconstitutional delegation of authority because "Congress has said nothing at all indicating how the [agency] should make that call." *Jarkesy*, 34 F.4th at 461–62. And jurists like Judges Sutton and Tymkovich have similarly expressed skepticism about delegating criminal-law-writing authority to agencies. *Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1027 (6th Cir. 2016) (Sutton, J., concurring in part and dissenting in part) (emphasizing that courts should not defer to agency interpretations of criminal statutes), *rev'd on other grounds*, 581 U.S. 385 (2017); *Aposhian*, 989 F.3d at 900 (Tymkovich, J., dissenting) ("[An agency] has no authority to substitute its moral judgment concerning what conduct is worthy of punishment for that of Congress."). So have eight judges on the en banc Fifth Circuit. *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality op.) ("For many jurists, the question of Congress's delegating legislative power to the Executive in the context of criminal statutes raises serious constitutional concerns.").

The statute at issue here presents even more acute problems than those unconstitutional statutes. For one, this statute is an apparently general-purpose authorization for BLM to issue all manner of its own agency-created regulations. 43 U.S.C. § 1733(a). And, perhaps yet more critically, that delegation has spawned regulations with criminal sanctions (as are at issue in this case). *See* ECF No. 1. That means that the BLM is acting not just with "virtually unfettered" discretion, *Schechter Poultry*, 295 U.S. at 542, and not just as some limited-purpose "expositor, executor, and interpreter of criminal laws," *Aposhian*, 989 F.3d at 900 (Tymkovich, J., dissenting) (emphasis omitted)—either of which would be an issue on its own. The BLM is

doing both; acting without any real guidance from Congress, it is setting criminal rules for nearly two-thirds of the state of Nevada. That violates the nondelegation doctrine.

We acknowledge the significance of this argument. It is true that, in the past eighty years, the Supreme Court has not concluded that a statute unconstitutionally delegated legislative power to a federal agency. *Cf. Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 474–75 (2001) (noting as much). And it is also true that, in that time, other courts have concluded that some statutes with fairly open-ended rulemaking authority nonetheless pass muster under the doctrine. *E.g.*, *Melgar-Diaz*, 2 F.4th at 1267 (concluding that a statute acceptably delegated to immigration authorities the decision where to place immigration entry-points); *United States v. Cassiagnol*, 420 F.2d 868, 876 (4th Cir. 1970) (concluding that a statute acceptably delegated to the General Services Administration the ability to criminalize certain conduct on properties it owned).

But those points do not doom the nondelegation argument here. The relative dormancy of the doctrine at the Supreme Court is best explained by lack of opportunity, not doctrinal invalidity. As the Fifth Circuit recently recognized, the Court has not "considered the issue when Congress offered *no guidance* whatsoever" for the better part of a century. *Jarkesy*, 34 F.4th at 462 (emphasis in original). But the last time the Court faced such a no-guidance statute (in *Panama Refining*), the Court concluded it was unconstitutional. *See id.* That case is, of course, still good law. *Id.* And this case falls into the same no-guidance bucket, and with greater criminal sanctions on the line no less. So it should follow the same—if not even stricter—rules.

And even if the sort of open-ended crime-writing authority at issue here might be acceptable when wielded by, say, the General Services Administration (which manages federal buildings), it is not acceptable to grant to the BLM. *See Whitman.*, 531 U.S. at 475 ("[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred."); *cf. Cassiagnol*, 420 F.2d at 876. For a simple reason, too: the

scope of the BLM's authority sweeps much broader than the GSA's, or, indeed, any other federal agency's.

The numbers alone prove how expansive the BLM's authority is. Nationally, the GSA manages 371 million square feet of space, slightly less than 8,517 acres.[8] In Nevada alone, the BLM manages over five-and-a-half thousand times that figure: 48 million acres—over 2 trillion square feet of space.[9] The net effect of that power: in Nevada, the BLM can (and, as this case illustrates, does) govern criminal misdemeanor offenses for nearly two-thirds of the state. That is constitutionally problematic even if the GSA's authority is not. *Whitman*, 531 U.S. at 475.

It does not have to be this way. Rather than delegate crime-writing authority to an agency (as it has here), Congress itself could exercise legislative power (as the Constitution directs). Congress has done as much for other sorts of federally-owned or -managed properties, creating statutes specifically applicable to (for instance) national forests, *e.g.*, 18 U.S.C. § 1853; military bases, *e.g.*, *id.* § 1382; federal prisons, *e.g.*, *id.* § 1793; foreign embassies, *e.g.*, *id.* § 970; and shipyards, *e.g.*, *id.* § 2291. And Congress has other statutory frameworks at its disposal, too, including incorporating relevant state law by reference. *See, e.g.*, *id.* § 13. Simply put, there is a clear alternative to allowing an agency to create its own crimes by regulation: the legislature could legislate.

In short, the statute and regulations at issue here sit in the heartland of the nondelegation doctrine. "Congress has said nothing at all" about how the BLM should "issue regulations necessary to implement the provisions of this Act with respect to the management, use, and protection of the public lands." *Jarkesy*, 34 F.4th at 462 (first quote); 43 U.S.C. § 1733(a)

---

[8] GSA, GSA Properties, available at https://www.gsa.gov/real-estate/gsa-properties (last accessed Mar. 17, 2023).

[9] *See* BLM, BLM Nevada History, https://www.blm.gov/about/history/history-by-region/nevada (last accessed Mar. 17, 2023).

(second one). And the BLM has used that free-ranging authority to erect an elaborate series of criminal laws—including the specific offenses charged here. The regulatory crimes at issue in Counts 2 and 3 of the indictment here are therefore the products of an unconstitutional delegation of legislative power. Those counts should be dismissed.

### 2. The Creation-Of-Risk Regulatory Charge Is Also Unconstitutionally Vague And Unconstitutionally Overbroad.

One of the charged regulatory offenses suffers from two more constitutional infirmities: it is unconstitutionally vague (both facially and as-applied) and unconstitutionally overbroad. In particular, the regulation undergirding Count 2 prohibits creating a "risk." 43 C.F.R. § 8365.1-4(a)(4) ("No person shall cause a public disturbance or create a risk to other persons on public lands by engaging in activities which include . . . [r]esisting arrest or issuance of citation . . . .").[10] And prohibitions on risks do not put defendants on sufficient notice of what, exactly, they cannot do. To the extent it survives the nondelegation challenge, then, Count 2 should be dismissed on void-for-vagueness and/or overbreadth grounds.

### a. The Creation-Of-Risk Regulation Is Impermissibly Vague.

Due process prohibits vague criminal laws. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). The threat of such vagueness is twofold. First, if a criminal law is vague, individuals may inadvertently engage in conduct they fairly think is legal. *Id.* And, second, enforcers may be encouraged to exploit that uncertainty; "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender v. Lawson*, 461 U.S.

---

[10] The indictment does not specify whether Count 2 is premised on "creat[ing] a risk" or on "caus[ing] a public disturbance." *See* ECF No. 1 at 2. Given the other charges in the indictment, we assume the government is proceeding on a "risk" theory. To the extent it is proceeding on a "public disturbance" theory, such a theory suffers from yet more significant vagueness problems, and is therefore equally deficient. *See United States v. Estrada-Iglesias*, 425 F. Supp. 3d 1265, 1271–75 (D. Nev. 2019) (concluding that a similar regulatory offense prohibiting "disorderly conduct" at federal buildings was void for vagueness). Either way, the count should be dismissed.

352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). Both problems cause due process concerns. *Id.*

A law is impermissibly vague if it fails to give fair notice—to both defendant and enforcer—of the conduct it prohibits. *Johnson v. United States*, 576 U.S. 591, 596 (2015). To avoid that result, the law must do two things; it must (1) define the offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited"; and (2) define the offense "in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States,* 561 U.S. 358, 402–03 (2010) (quoting *Kolender*, 461 U.S. at 357); *see also United States v. Zhi Yong Guo*, 634 F.3d 1119, 1122–23 (9th Cir. 2011) (noting that the "test is whether the text of the statute and its implementing regulations, read together, give ordinary citizens fair notice with respect to what the statute and regulations forbid, and whether the statute and regulations read together adequately provide for principled enforcement by making clear what conduct of the defendant violates the statutory scheme"). If a criminal law fails to satisfy either requirement, it is void for vagueness. *Skilling*, 561 U.S. at 403.

Laws that penalize creating risks (as 43 C.F.R. § 8365.1-4(a)(4) does) are commonly void for vagueness on both prongs. *E.g.*, *Johnson*, 576 U.S. at 596; *Dimaya*, 138 S. Ct. at 1211, 1216; *Davis*, 139 S. Ct. at 2324. The Supreme Court's recent *Johnson* decision is helpful illustration. 576 U.S. at 594–602. In that case, the Court concluded that 18 U.S.C. § 924(e)(1), which provided enhanced sentencing penalties for "conduct that presents a serious potential risk of physical injury to another," was unconstitutionally vague. *Id.* at 594, 597. The particular steps of *Johnson*'s reasoning are instructive. To begin, the Court emphasized that any attempt to determine the "risk posed by a crime" suffers from "grave uncertainty." *Id.* at 597–98. That much was evident, the Court identified, from the courts of appeals' various unsuccessful attempts to establish a working standard to determine "risk." *Id.* at 598–600 (criticizing reliance on statistics and attempts to assess whether conduct included "aggressive conduct," among other considered methods). And the difficulty in doing so stems in large part from the fact that

14

risk is hard to ascertain *ex ante*; there is "pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider" in reaching a working risk definition. *Id.* As such, the Court concluded that, at least in most contexts, prohibiting the creation of risk "denie[d] fair notice to defendants and invite[d] arbitrary enforcement by judges." *Id.* at 597.

That is not the only "risk" statute the Supreme Court has held is unconstitutionally vague. The Court has done the same with 18 U.S.C. § 924(c), which provides heightened criminal penalties for carrying a firearm "during and in relation to," or possessing one "in furtherance of" a "crime of violence or drug trafficking crime." 18 U.S.C. § 924(c)(1)(A). The statute, similar to 18 U.S.C. § 924(e)(2), defines crime of violence, in part, as any crime "that by its nature, involves a substantial *risk* that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3) (emphasis added). For many of the same reasons identified in *Johnson*, the Supreme Court concluded that 18 U.S.C. § 924(c)(3) was void-for-vagueness. *Davis*, 139 S. Ct. at 2324. The Court also concluded similarly in *Sessions v. Dimaya*, holding that language in 8 U.S.C. §§ 1101(a)(43)(F) & 16 that subjected non-citizens to removal if they had committed a crime of violence (defined using similar "involves a substantial risk" language at issue in *Davis*) was unconstitutionally vague. 138 S. Ct. at 1211, 1216.

The same reasoning applies here. 43 C.F.R. § 8365.1-4(a)(4) suffers from essentially the same problems as 18 U.S.C. § 924(e)(2), 18 U.S.C. § 924(c)(3), and 8 U.S.C. §§ 1101(a)(43)(F) & 16. Like those statutes, the regulation at issue in Count 2 effectively requires citizens, enforcers, and judges to estimate the risk present in any action before any consequences actually materialize. In doing so, it requires all involved to predict not just the direct results of the defendant's conduct, but also the new landscape of hypothetical and contingent events that such conduct might make more or less likely. That creates an unknown invisible line of risk that turns an otherwise legal action into criminal conduct. Both *how* to

15

estimate the risk and the *quantity* of risk allowed are left unconstitutionally open-ended. That leaves citizens in the dark and risks arbitrary enforcement of the regulation.

To be sure, "risk" statutes can sometimes salvage themselves by anchoring the proscribed conduct to "real-world facts." *Johnson*, 576 U.S. at 598. But the regulation here fails to do that. To the contrary, the "risk" language here is accompanied by "a confusing list of examples." *Id.* at 603 (noting that such a feature amplifies vagueness problems). In particular, the regulation here lists six examples of purportedly "risk[y]" conduct—but some of those examples would not appear to create any "risk to other persons." 43 C.F.R. § 8365.1-4(a). "Making unreasonable noise", "Creating a . . . nuisance", and "Refusing to disperse" either pose no such risk to other humans or are, at the very least, differently-risky than "committing a battery." *Id.* And yet they are all lumped together as examples of "risk[y]" conduct. Providing such varied examples leaves defendants and enforcers alike unsure as to what this regulation actually prohibits; "The phrase 'shades of red,' standing alone, does not generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, *navy blue,* or colors that otherwise involve shades of red' assuredly does so.'" *Johnson*, 576 U.S. at 603 (emphasis in original) (quoting *James v. United States*, 550 U.S. 192, 230 n.7 (2007) (Scalia, J., dissenting)). That is, even if the "risk" language on its own was acceptable, the example list would render the regulation unconstitutionally vague.

As such, to the extent Count 2 is not dismissed on nondelegation grounds, it should be dismissed on void-for-vagueness grounds.

### b.    The Creation-Of-Risk Regulatory Charge Is Also Unconstitutionally Overbroad.

The "risk" regulation is also overbroad. "[R]isk" is undefined in the regulation. And, as discussed, an understanding of "risk" varies from person to person. So the regulation practically entrusts "lawmaking to the moment-to-moment judgment" of BLM officers, and thus encroaches on a substantial amount of constitutionally protected conduct—particularly, speech

and assembly. *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (quoting *Kolender*, 461 U.S. at 360).

That renders the "risk" regulation unconstitutionally overbroad. *Id.* ("[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612–15 (1973))); *see also Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) (invalidating vagrancy statute for encroachments on First Amendment guarantees). Therefore, to the extent 43 C.F.R. § 8365.1-4(a) assigns criminal liability by mere reference to conduct considered "risk[y]," the regulation is facially invalid as substantially overbroad. [11]

On its face, the "risk" regulation would appear to sweep up all manner of protected speech—including the alleged profanity potentially at issue here. *United States v. Stevens*, 559 U.S. 460, 474 (2010) ("'[T]he first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers.'" (citing *United States v. Williams*, 553 U.S. 285, 293 (2008))). A suicidal utterance is protected speech, *see Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 631 (E.D. Va. 2016) (a suicidal utterance is not a "true threat" or "fighting words"), as is the use of the profanity, including the f-word. *See Cohen v. California*, 403 U.S. 15, 24 (1971) ("Fuck the Draft" is protected speech even though this "distasteful mode of expression was thrust upon unwilling or unsuspecting viewers"). Accordingly, to the extent the government seeks to enforce 43 C.F.R. § 8365.1-4(a) against Mr. Pheasant in whole or in part for his profanity, Count 2 targets protected speech and should be dismissed.

---

[11] The same is true should the government elect to proceed on Count 2 under a "public disturbance" theory, which arguably presents even more significant overbreadth problems. *See United States v. Estrada-Iglesias*, 425 F. Supp. 3d 1265, 1271–75 (D. Nev. 2019)

17

**B.    The Indictment Should Be Dismissed Since All Three Counts Fail To State An Offense And Lack Sufficient Factual Specificity**

Beyond those constitutional problems, the three counts in the indictment each suffer from one of two related defects: they variously fail to include essential elements and fail to provide necessary factual specificity to the elements they do plead. Both problems are fatal. FED. R. CRIM. P. 12(b)(3)(B)(iii), (v) (requiring dismissal where an indictment lacks specificity or fails to state an offense); *see generally* WAYNE LAFAVE ET AL., 5 CRIM. PROC. § 19.3(a)–(c) (4th ed. & Update 2022) (describing various forms of pleading defects).

Most obviously, an indictment fails to state an offense when it omits any essential element of the crime charged. *United States v. Qazi*, 975 F.3d 989, 993–94 (9th Cir. 2020). That includes omitting any heightened intent requirement. *United States v. Du Bo*, 186 F.3d 1177, 1180 (9th Cir. 1999) (concluding that an indictment should be dismissed where it "lacks a necessary allegation of criminal intent"). Such an omission is a "fatal flaw" that requires "automatic dismissal," "regardless of whether the omission prejudiced the defendant." *Qazi*, 975 F.3d at 992, 994 (quotation omitted).

An indictment can also fail for lack of specificity by omitting "the essential facts necessary to apprise a defendant of the crime charged." *United States v. Buckley*, 689 F.2d 893, 896 (9th Cir. 1982) (quotation omitted); *see generally* FED. R. CRIM. P. 7(c)(1) (requiring a "plain, concise, and definite written statement of the essential facts constituting the offense charged"); *Russell v. United States*, 369 U.S. 749, 764 (1962) (emphasizing that an "essential criterion" of an indictment is "to sufficiently apprise the defendant of what he must be prepared to meet" (quotation omitted)). Such a requirement serves "[t]wo corollary purposes": (1) "to ensure that the defendant[] [is] being prosecuted on the basis of the facts presented to the grand jury"; and (2) "to allow the court to determine the sufficiency of the indictment." *Buckley*, 689 F.2d at 896.

### 1. The Assault Charge (Count 1) Fails To State An Offense And Lacks Sufficient Factual Specificity.

The assault charge (Count 1) suffers from both sort of pleading defects: it fails to state an offense and lacks sufficient factual specificity. In particular, three aspects of the charge are insufficiently clear: the type of alleged assault, the source of the alleged bodily injury, and identification of the injury itself. These three deficiencies—cumulatively or individually—warrant dismissal. *See Russell*, 369 U.S. at 764.

### a. Count 1 Fails To Identify The Type Of Assault Mr. Pheasant Allegedly Committed And Thus Necessarily Fails To Properly Plead The Operative Elements.

The first problem with the assault charge is its failure to identify how the government thinks Mr. Pheasant "forcibly assault[ed], resist[ed], oppose[d] and interfere[d] with" a BLM officer. ECF No. 1. The indictment wholly fails to identify what species of assault Mr. Pheasant purportedly committed. This matters since each species of the assault has different elements.

There are two forms of assault: "a willful attempt to inflict injury" (often called attempted-battery assault) and "a threat to inflict injury . . . which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm" (often called intent-to-frighten assault). *United States v. Acosta-Sierra*, 690 F.3d 1111, 1117 (9th Cir. 2012) (quoting *United States v. Chapman*, 528 F.3d 1215, 1218 (9th Cir. 2008)) (interpreting 18 U.S.C. § 111, the same statute at issue here). Those different types of assault are independent from each other; conduct can constitute one, both, or neither form of assault. *Id.*

Perhaps most critically here, the two forms of assault involve "distinct elements." *Id.* at 1118. Among other differences, attempted-battery assault requires an intent to commit a battery (irrespective of whether the victim is aware of the conduct), while intent-to-frighten assault requires that the victim be "aware[] of the threat" (irrespective of whether the defendant is attempting to actually commit a battery). *Id.* at 1118, 1120–21. So, while the two forms of assault sometimes overlap, there are "important nuances" that make them effectively different

19

crimes. *Id.* at 1118. Correspondingly, that means there are "important" differences in raising a defense to an attempted-battery assault compared to an intent-to-frighten assault. *Id.*

But the indictment does not identify what form of assault the government thinks Mr. Pheasant committed. It alleges merely that he "forcibly assault[ed], resist[ed], oppose[d] and interfere[d]" with a BLM officer in a way that "inflict[ed] bodily injury." ECF No. 1. Those allegations could equally mean that the government thinks Mr. Pheasant had attempted a battery on the BLM officer *or* that the government thinks Mr. Pheasant had intended to frighten the BLM officer. It is not clear whether one, both, or neither of those theories was presented to the grand jury. *Buckley*, 689 F.2d at 896. And, for the same reasons, it is not clear what sort of assault theory Mr. Pheasant is supposed to defend against at trial, since Count 1 fails to discernably plead either of the two theories. That renders Count 1 defective. Accordingly, that count should be dismissed. *See id.*

> **b.** **The Assault Charge Also Fails To Identify What Caused The Bodily Injury And Fails To Identify The Bodily Injury That Was Allegedly Suffered.**

The second—and equally fatal—problem with Count 1 is that it fails to identify how the government believes Mr. Pheasant's alleged conduct "inflict[ed] bodily injury," while also failing to plead what the supposed injury was. ECF No. 1.

That is a particular concern because the causation and injury questions go to an element of the alleged felony offense. Alleging that a putative assault "inflict[ed] bodily injury" turns what would otherwise be a misdemeanor assault into felony assault. 18 U.S.C. § 111(b). It is therefore an element. *United States v. Vela*, 624 F.3d 1148, 1159 (9th Cir. 2010) (holding that, for § 111(b), "one of the offense elements is a finding of . . . infliction of bodily injury"). And so factual specificity about what, exactly, "inflict[ed] bodily injury" is critical, as is identification of the injury itself. *See* WAYNE LAFAVE ET AL., 5 CRIM. PROC. § 19.3(c) (collecting cases and emphasizing that "courts are more likely to require specificity as to facts establishing an element of the offense"). Without such specificity, Mr. Pheasant is not on

20

sufficient notice of what he did that puts him at risk of a potential felony conviction. Nor does he have notice of the specific injury he should prepare to contest at trial.

The failure to identify what it was about Mr. Pheasant's alleged conduct that "inflict[ed] bodily injury" on the BLM officer, and the failure to identify that supposed injury, renders Count 1 deficient. ECF No. 1. That count should therefore be dismissed.

### c.     To The Extent These Deficiencies Do Not Warrant Dismissal, The Government Should Be Directed To Issue A Bill Of Particulars On Count 1.

To the extent this Court does not dismiss Count 1 on the grounds discussed above, it should direct the government to issue a bill of particulars explaining (1) the sort of assault the government is charging, (2) how the government believes the alleged bodily injury was inflicted, and (3) what the supposed injury was. FED. R. CRIM. P. 7(f).

A bill of particulars is appropriate where, as here, the indictment's allegations incompletely advance various potential theories of criminal liability, each of which would require different defense responses. *E.g.*, *United States v. Peskett*, No. 2:14-cr-00328-KJD-NJK, 2015 WL 13849347, at *3–4 (D. Nev. May 12, 2015) (citing *United States v. Giese*, 597 F.2d 1170, 1180, 1181 (9th Cir. 1979)). And while full discovery can "obviate[]" the need for a bill of particulars, discovery here has failed to narrow down exactly what sort of assault the government thinks Mr. Pheasant has committed, how the government thinks the alleged bodily injury was inflicted, and what the injury was. *United States v. Larkin*, No. 2:12-CR-319-JCM-GWF, 2017 WL 11466796, at *3 (D. Nev. Jan. 25, 2017) (quoting *Giese*, 597 F.2d at 1180).

Without such details, Mr. Pheasant will be forced to defend against an amorphous charge with multiple competing (and potentially contradictory) theories of criminal liability. Insofar as Count 1 survives dismissal, a bill of particulars on that count is therefore warranted.

## 2.    The BLM Regulatory Charges Fail To State An Offense And Lack Sufficient Factual Specificity.

The two alleged violations of BLM-created offenses (Count 2 and Count 3) likewise suffer from the same two forms of pleading deficiency: they both fail to allege necessary *mens rea* elements, and lack sufficient factual specificity. As such, to the extent the Court concludes the counts do not warrant dismissal on the various constitutional grounds raised above, it should dismiss both Count 2 and Count 3 as deficiently pled under Rule 12(b)(3)(B)(iii), (v). *Qazi*, 975 F.3d at 992, 994.

The omission-of-elements problem arises from the fact that the BLM's criminal regulations are subject to heightened *mens rea* requirements. That is because the relevant authorizing statute—43 U.S.C. § 1733(a)—only allows the government to seek criminal penalties when a defendant "knowingly and willfully" violates regulations issued by the BLM. 43 U.S.C. § 1733(a); *see United States v. Henderson*, 243 F.3d 1168, 1171 (9th Cir. 2001). That language, the Ninth Circuit has said, makes it "clear" that the government must allege and prove that the defendant "was aware that the conduct in question was unlawful." *Henderson*, 243 F.3d at 1171. That makes criminal regulations issued under 43 U.S.C. § 1733(a) specific intent offenses. *Id.* at 1173. Yet, contrary to caselaw, the indictment against Mr. Pheasant misleadingly pleads Count 2 and Count 3 as if they are strict liability.

As described at length above, both 43 C.F.R. § 8365.1-4(a)(4) and 43 C.F.R. § 8341.1(f)(5), (h), were promulgated under the authority of 43 U.S.C. § 1733(a). *See* 43 C.F.R. § 8365.1-4 (identifying 43 U.S.C. § 1701 *et seq.* as one of the sources of authority); *id.* § 8341.1 (same). They are therefore subject to the heightened "knowingly and willfully" *mens rea* requirement. *Henderson*, 243 F.3d at 1171. That means that, to have violated 43 C.F.R. § 8365.1-4(a)(4), Mr. Pheasant had to have knowingly prevented or attempted to prevent the

BLM officer from executing an arrest or issuing a citation[12] and had to have known that doing

so was unlawful. And, to have violated 43 C.F.R. § 8341.1(f)(5), (h), Mr. Pheasant had to have

known that he needed lighted taillights from a half-hour after sunset to a half-hour before

sunrise, and that he was riding during that time frame without them, and that doing so was

---

[12] Although *Henderson* alone resolves the question, we note that this *mens rea* requirement aligns with at least 21 state resisting-arrest statutes, including Nevada's. NEV. REV. STAT. § 199.280 (requiring that the defendant "willfully resist[], delay[] or obstruct[] a public officer in discharging . . . any legal duty"); *see Scott v. First Jud. Dist. Ct.*, 363 P.3d 1159, 1163 n.4 (Nev. 2015) (noting that Nevada's resisting-arrest statute is "explicitly limited by an intent requirement"); *see also Sims v. State*, 733 So. 2d 926, 929 (Ala. Crim. App. 1998) (concluding that resisting arrest requires prevention or attempted prevention a peace officer from effecting a lawful arrest of himself or of another person); ALASKA STAT. § 11.56.700(a) (requiring "intent of preventing [an] officer from making [an] arrest"); CAL. PENAL CODE § 69(a) (requires intent to "deter or prevent an executive officer from performing any duty imposed upon the officer by law"); COLO. REV. STAT. § 18-8-103(1) (requiring "knowingly prevent[ing] or attempt[ing] to prevent" an arrest); DEL. CODE ANN. tit. 11, § 1257(a)(1) (requiring "intentionally prevent[ing] or attempt[ing] to prevent" an arrest); HAW. REV. STAT. § 710-1026(1) (requiring "intentionally prevent[ing]" an arrest); KAN. STAT. ANN. § 21-5904(a)(3) (requiring "knowingly obstructing, resisting or opposing" an officer from "the discharge of any official duty"); ME. REV. STAT. ANN. tit. 17-A, § 751-B(1) (requiring an "intent to hinder, delay or prevent" an officer from "effecting the arrest"); MASS. GEN. LAWS. ch. 268, § 32B(a) (requiring "knowingly prevent[ing] or attempt[ing] to prevent a peace officer" "from effecting an arrest"); MINN. STAT. § 609.50 (requiring "intentionally" "obstruct[ing], hinder[ing], or prevent[ing] the lawful execution of any legal process"); MONT. CODE. ANN. § 45-7-301(1) (requiring "knowingly prevent[ing] or attempt[ing] to prevent a police officer" "from effecting an arrest"); NEB. REV. STAT. § 28-904(1) (requiring "intentionally preventing or attempting to prevent" an officer from "effecting an arrest"); N.J. STAT. ANN. § 2C:29-2 (requiring "purposely prevent[ing] or attempt[ing] to prevent a law enforcement officer from effecting an arrest") N.Y. PENAL LAW § 205.30 ("intentionally prevent[ing] or attempt[ing] to prevent" an officer from "effecting an authorized arrest."); N.D. CENT. CODE § 12.1-08-02(1) (requiring "intent to prevent a public servant from effecting n arrest"); 18 PA. CONS. STAT. § 5104 (requiring "intent of preventing a public servant from effecting a lawful arrest"); TENN. CODE ANN. § 39-16-602(a) (requiring "intentionally prevent[ing] or obstruct[ing]" someone "from effecting a stop, frisk, halt, arrest or search of any person"); TEX. PENAL CODE § 38.03(a) (requiring "intentionally prevent[ing] or obstruct[ing]" an officer "from effecting an arrest, search, or transportation"); VT. STAT. ANN. tit. 13, § 3017 (requiring "intentionally . . . attempt[ing] to prevent a lawful arrest"); WASH. REV. CODE § 9A.76.040 (requiring "intentionally prevent[ing] or attempt[ing] to prevent" a lawful arrest).

unlawful. Moreover, by failing to allege any facts that trend with the omitted *mens rea* elements, Count 2 and Count 3 similarly fail for lack of specificity.

The BLM regulatory charges conspicuously fail to allege necessary *mens rea* elements, and fail for lack of sufficient factual specificity.[13] *See* ECF No. 1. Accordingly, to the extent Count 2 and Count 3 are not dismissed on constitutional grounds, they should be dismissed as defectively pled.

## IV.    CONCLUSION

Mr. Pheasant respectfully requests the Court dismiss the indictment in its entirety. Alternatively, to the extent the Court does not dismiss Count 1 for whatever reason, Mr. Pheasant respectfully requests the Court direct the government to issue a bill of particulars as to that count.

DATED this March 17, 2023.

RENE L. VALLADARES
Federal Public Defender

By:    */s/ Sean A. McClelland*

SEAN A. MCCLELLAND
Assistant Federal Public Defender
CHRISTOPHER P. FREY
Assistant Federal Public Defender

---

[13] Count 2 similarly fails to provide any notice of whether the government's theory of liability is premised on Mr. Pheasant "creat[ing] a risk" or "caus[ing] a public disturbance" through his actions. *See supra* notes 10-11; *see* ECF No. 1 at 2. Both the creation of a risk and causing a public disturbance are alternative elements of a violation of 43 C.F.R. § 8365.1-4(a)(4). By pleading neither element, nor including any factual basis in the indictment that would satisfy these elements, Count 2 fails to state an offense and is defective due a lack of sufficient factual specificity. For this separate reason, Count 2 should be dismissed.

24

## <u>CERTIFICATE OF ELECTRONIC SERVICE</u>

The undersigned hereby certifies that she is an employee of the Federal Public Defender for the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

That on March 17, 2023, she served an electronic copy of the above and foregoing Motion to Dismiss by electronic service (ECF) to the person named below:

> JASON FRIERSON
> United States Attorney
> RANDOLPH J. ST. CLAIR
> Assistant United States Attorney
> 400 South Virginia Street, Suite 900
> Reno, NV 89501

> */s/ Katrina Burden*
> Employee of the Federal Public Defender

25