RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
SEAN A. MCCLELLAND
Assistant Federal Public Defender
District of Columbia Bar No. 90001362
CHRISTOPHER P. FREY
Assistant Federal Public Defender
Nevada State Bar No. 10589
200 South Virginia Street, Suite 340
Reno, Nevada 89501
(775) 321-8451/Phone
(702) 388-6261/Fax
Sean_McClelland@fd.org
Chris_Frey@fd.org

Attorneys for GREGORY W. PHEASANT

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:21-CR-024-RCJ-CLB |
| Plaintiff, | **REPLY IN SUPPORT OF MOTION TO SUPPRESS**[1] |
| v. | |
| GREGORY W. PHEASANT, | [Evidentiary Hearing Requested] |
| Defendant. | |

## I. INTRODUCTION

Officers had no reason to suspect Mr. Pheasant knew his taillight was out. They claim to have "tried" to tell him. But there is no sign they succeeded. And yet they detained him with a baton to the spokes.

They needed evidence of knowledge to do that. The BLM's taillight crime requires specific intent. The government's claim otherwise misunderstands the relevant authority, *United States v. Henderson*, 243 F.3d 1168 (9th Cir. 2001). There is no "obviously unlawful"

---

[1] This reply is timely filed. ECF No. 62. The defense understands the briefing schedule set on this motion to remain undisturbed by the April 13, 2023, status conference and calendar call. *See* ECF No. 66.

carveout to that case. That phrase is part of *Henderson*'s reasoning about why all BLM crimes require specific intent—not some exception to that specific-intent rule.

The government's various other arguments are similarly unavailing. This Court should suppress evidence stemming from Mr. Pheasant's detention.

## II.     ARGUMENT

### A.     An Evidentiary Hearing Is Necessary.

As a preliminary point, an evidentiary hearing remains necessary on this motion.[2] The government's response essentially concedes as much, expressly stating that resolution of the motion turns on "the anticipated testimony at an evidentiary hearing." ECF No. 64 at 2; *see also id.* at 17 n.7 (arguing that Mr. Pheasant was "clearly identified" "based on . . . anticipated testimony of the BLM rangers"); *id.* at 20–21 (arguing that "the court could infer the defendant had intentionally disconnected his taillight at some point" "[f]rom . . . the anticipated testimony of the rangers").

We agree. Discovery shows that this detention was unlawful. *See generally* ECF No. 57. From the submitted materials, officer conduct was aggressive enough—including a baton to the spokes of Mr. Pheasant's bike—to constitute an arrest. And doing all that was unsupported by either reasonable suspicion or probable cause; officers had no reason to believe Mr. Pheasant knew he was violating the taillight regulation. The government represents that officer testimony might nonetheless alter that calculus. The government should be put to its burden.

### B.     Mr. Pheasant Was Unconstitutionally Detained.

Evidentiary hearing or no, the already-proffered evidence reveals Mr. Pheasant's detention was unlawful. This was a de facto arrest, and without probable cause in support. But

---

[2] The parties and Court discussed the need for an evidentiary hearing at the Status Conference on April 13, 2023. Mr. Pheasant maintains that evidence is required to resolve his instant motion to suppress.

2

even if it were not, the same facts reveal that officers lacked even reasonable suspicion that Mr. Pheasant knew his taillight was out. That renders the detention constitutionally deficient.

### 1. Officers De Facto Arrested Mr. Pheasant.

The government chiefly defends the detention by claiming it was a stop rather than an arrest. ECF No. 11–17. The government is wrong. The officers' tactics here were more intrusive than an investigatory stop. And those tactics were not justified by the minor nature of the purported violation at issue here—an inoperable taillight. This was an arrest.

### a. Officers' Conduct Was Too Intrusive To Be A Stop.

The intrusiveness of officer conduct here went beyond the scope of a stop. *See* ECF No. 57 at 7–9. The intrusion started at the same time the detention itself did: the detention started with Ranger Yost thrusting his baton through the spokes of Mr. Pheasant's motorcycle. *Id.* at 7–8. And it continued throughout the detention, too: more officers arrived, lights blaring, and directed Mr. Pheasant's movements. *Id.* at 8–9. All that goes far beyond a typical investigatory stop. *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996).

The government's primary response is to claim that officers detained Mr. Pheasant "without any use of force." ECF No. 64 at 14. That claim is incorrect. Ranger Yost used his baton to disable Mr. Pheasant's bike. Exhibit A at USAO 3, ECF No. 57-1; *see* ECF No. 57 at 7–8. That was a use of force. *Cf. United States v. Guzman-Padilla*, 573 F.3d 865, 879 (9th Cir. 2009) (concluding that the use of spike strips to disable vehicles was intrusive enough to require a heightened evidentiary burden by the government during a border search). That Mr. Pheasant's vehicle bore the brunt of that force does not diminish that conclusion. *Id.*

Indeed, the use of the baton beforehand was also an intrusive—and forceful—tactic. *See* ECF No. 57 at 7–8. To have thrust the baton through Mr. Pheasant's spokes, Ranger Yost had to have been, at the very least, holding it. And it would have been visible to Mr. Pheasant as it was being moved towards (and then through) the wheel of his bike. Such a "display of a weapon" goes beyond the intrusion of an ordinary stop. *Johnson v. Bay Area Rapid Transit*

3

*Dist.*, 724 F.3d 1159, 1177 (9th Cir. 2013). That is especially so here. The display and use of the baton here was designed to advance the detention. *See id.* And it happened right next to Mr. Pheasant himself. A reasonable person in his shoes would have been intimidated—and, particularly, feel unfree to leave.

The government nonetheless quibbles that the use of the baton might not have involved "wielding" or "brandishing." ECF No. 64 at 22. But a plain reading of Ranger Yost's own report suggests that he did both. Exhibit A at USAO 3, ECF No. 57-1. How could someone "quickly exit[]" a vehicle and "st[i]ck a baton through the spokes in the front tire" of a bike *without* wielding the baton? *Id.*[3] Nothing in Ranger Yost's report suggests the baton got there accidentally; quite the opposite, he "stuck" it there. *Id.* And a natural understanding of Ranger Yost's mission with the baton also indicates that brandishing was involved too. As the government itself admits, the display and use of the baton was specifically designed to control Mr. Pheasant's conduct. ECF No. 64 at 22 ("[T]he preeminent thought in Ranger Yost's mind was to stop the defendant's ability to flee on his motorcycle . . . . Ranger Yost used his baton as a disabling tool to keep the defendant from fleeing on his motorcycle."). That is classic brandishing.[4]

Ultimately, though, whether the conduct fits a technical legal definition of either term is beside the point. What Ranger Yost did with the baton is undisputed: he thrust it between the spokes of Mr. Pheasant's bike. *See* ECF No. 64 at 8 ("[Ranger Yost] quickly exited his UTV and stuck his baton through the spokes . . . ."). And using a weapon at all is an intrusive tactic ordinarily beyond the scope of a stop. *Johnson*, 724 F.3d at 1177 ("[W]e begin from the

---

[3] *See, e.g.*, *Hughes v. Kisela*, 8622 F.3d 775, 790 n.3 (9th Cir. 2016) (Berzon, J., concurring in the denial of reh'g en banc) (collecting definitions for "wield"; noting the term implies the use of an object "with skill and effect" or "actuating, plying, or employing" the object for a particular purpose).

[4] *See, e.g.*, 18 U.S.C. § 924(c)(4) (defining "brandish" for firearms-related conduct as "display[ing] all or part of the firearm, or otherwise mak[ing] the presence of the firearm known to another person, in order to intimidate that person").

presumption that no weapons are used at all in conducting an investigatory stop."). Especially when coupled with the various intrusive tactics that followed—the officers surrounding Mr. Pheasant, flashing their police lights at him, directing his movements, and threatening to handcuff him—the detention was an arrest.

### b. Those Tactics Were Not Justified.

Nothing justified those tactics. Mr. Pheasant was not violent, not armed, and not disruptive. *Washington*, 98 F.3d at 1189. So officers had none of the recognized reasons to take the steps they took here. *Id.*

For its part, the government claims just one possible justification for the intrusive officer conduct: that Mr. Pheasant had earlier "attempt[ed] to flee from the rangers." ECF No. 64 at 15. That alleged refusal-to-stop conduct, the government asserts, was enough to warrant a baton to the spokes. Indeed, the government says, Ranger Yost "could have used more force" and could have "physically restrain[ed]" Mr. Pheasant himself. *Id.*

The biggest problem for that position is that the government cites no evidence that Mr. Pheasant had previously been asked to stop. *See* ECF No. 64 at 15. There does not appear to be any. Most significantly, there is no bodycam footage of Mr. Pheasant being asked to stop prior to having the baton thrust into his bike. *Cf.* Exhibit D, USAO 18, ECF No. 57-4 (not asking Mr. Pheasant to stop). What other evidence there is suggests essentially everything the officers said while driving was inaudible to Mr. Pheasant. *See* Exhibit A at USAO 3, ECF No. 57-1 (noting that Ranger Yost "tried" to say some things). Off-road vehicles are loud. *Listen to* Exhibit D, USAO 18, ECF No. 57-4. Mr. Pheasant was also, quite sensibly, wearing a helmet—further limiting any ability to hear any statements. *See id.* Far from prove Mr. Pheasant had previously "attempt[ed] to flee," then, the evidence tends to show that any officer communications merged into the ambient noises of Moon Rocks festivities.

Even if Mr. Pheasant had refused earlier commands, however, that would still not be enough to justify the use of arrest-like tactics. *Sialoi v. City of San Diego*, 823 F.3d 1223, 1234

5

(9th Cir. 2016) ("An individual's temporary refusal to comply with an officer's demands is not in itself a valid basis for an arrest."). An officer cannot take a weapon to a vehicle just because it took a couple of minutes for the driver to pull over. *Id.* Nor, therefore, would concluding Mr. Pheasant was arrested here "be the same" as holding "that every individual stopped for speeding . . . had similarly been arrested." ECF No. 64 at 16. In an ordinary traffic stop, officers do not use their weapons to disable a vehicle's wheels. That they did so here made this detention a de facto arrest from the get-go.

In short, officers took a range of actions intended to physically limit Mr. Pheasant's movement. Those tactics—starting at the detention's inception with a baton to the spokes of his bike—were more intrusive than warranted by the circumstances. This was a de facto arrest.

### 2. Officers Lacked A Sufficient Basis To Detain Mr. Pheasant.

Officers could not detain Mr. Pheasant like that. Nothing gave them reasonable suspicion, never mind probable cause, to believe that Mr. Pheasant knew that his taillight was out, the sole basis for the detention. They therefore could not stop him, let alone de facto arrest him, for that alleged taillight violation.

As an initial point on this front, the government does not dispute that the only possible reason for the detention was the alleged taillight problem. For good reason; Ranger Yost had no other reason to suspect misconduct. *See* ECF No. 64 at 12 n.5 (conceding that Ranger Yost "was not aware" of Mr. Pheasant's alleged conduct towards Ranger Sarcinella); *see also* ECF No. 57 at 12–15 (addressing the same). This Court's analysis here can therefore start and end with the alleged taillight issue.

On that taillight issue, the government insists that: (1) the taillight issue is a general intent offense for which evidence of knowledge is unnecessary; and, alternatively, (2) officers had a sufficient basis to believe Mr. Pheasant knew his taillight was deficient. Both arguments are wrong.

### a.     The Taillight Offense Requires Evidence Of Specific Intent.

BLM-created crimes require specific intent—not general intent. The Ninth Circuit held as much in *Henderson*, 243 F.3d at 1173. That case is controlling. The alleged taillight violation here therefore requires that Mr. Pheasant "was aware that the conduct in question was unlawful." *Id.* at 1171. With no indication of such knowledge, officers could not detain Mr. Pheasant.

*Henderson* notwithstanding, the government claims that the taillight offense is actually a general-intent crime. ECF No. 64 at 19–20. There is, for starters, reason to reject the government's general-intent argument here without even reaching its merits: the government has all but conceded the opposite in other filings. In response to Mr. Pheasant's motion-to-dismiss arguments that the indictment fails to adequately plead specific-intent elements for (as relevant here) the taillight offense, the government represents that it will file a superseding indictment to allege requisite *mens rea* elements. ECF No. 63 at 13. That should be treated for what it is: a concession that the taillight offense (and, for that matter, the creation-of-risk one) requires evidence of specific intent.

Even if the Court were to overlook the government's apparent concession on specific intent, however, the government's general-intent argument here is foreclosed by *Henderson*. Per that case, the statute that lets BLM write crimes, 43 U.S.C. § 1733(a), "clear[ly]" requires that the government "show that violations of BLM regulations were committed 'knowingly *and* willfully.'" 243 F.3d at 1171 (emphasis in original). That knowingly-and-willfully language makes the statute itself "a specific-intent offense." *Id.* at 1170. And so all of the regulations promulgated under that section (like the taillight offense at issue here) are specific-intent offenses too. *Id.* at 1173. In short, the plain language makes clear that "violations of BLM regulations enforced under 43 U.S.C. § 1733(a) are specific-intent offenses." *Id.*

That much, the *Henderson* court said, was confirmed by two additional interpretive principles about specific intent. *Id.* at 1172. *Henderson* identified that "in the criminal context," Congress is presumed to require "proof of knowledge of unlawfulness" (1) "when the criminal conduct is contained in a regulation instead of in a statute" and (2) "when the conduct punished is not obviously unlawful." *Id.* And both things were true of § 1733(a); the statute both did its crime-writing via agency and let the agency regulate some potentially innocent conduct (like digging for buried treasure) in the process. *Id.* at 1173. Those features, like the text itself, confirmed that the statute and all of its regulations required specific intent. *Id.*

"[I]n order to sustain a conviction" in BLM-regulatory-charge case (like this one), then, the government needs to "establish that Defendant was aware that the conduct in question was unlawful." *Id.* at 1171. No ifs, ands, or buts. All BLM-created regulatory offenses require specific intent.

Per the government, however, *Henderson*'s conclusion does not extend to any regulatory offenses that are "obviously unlawful." ECF No. 64 at 20. And, according to the government, it is "obviously unlawful" to drive without a functioning taillight. *Id.*

Both moves in that reasoning are wrong. First: there is no obviously-unlawful exception to *Henderson*. That language is an analytical step, not a carveout. Congress let the BLM criminalize some "apparently innocent" conduct (like digging for buried treasure) under § 1733(a). *Henderson*, 243 F.3d at 1172 (quotation omitted). And that, *Henderson* says, indicates that Congress "wanted" every regulation issued under the statute "to require a voluntary, intentional violation of a known legal duty." *Id.* at 1173 (quotation omitted). There are other indications of that purpose, too. The specific-intent requirement is also confirmed by (naturally) the plain language of the statute itself ("knowingly and willfully"), as well as the fact that "the conduct penalized . . . is listed not in the statute, but in administrative regulations." *Id.* Given all three considerations, *Henderson* concluded that the authorizing statute itself—and therefore all BLM-created criminal regulations—requires specific-intent. *Id.* That means that

8

the fact that the statute lets the BLM issue "some regulations" that "bar conduct that is not obviously illegal" is simply one reason why the top-level statute requires specific intent for all the regulations it authorizes. *Id.* There is not a general-intent carveout for "obviously unlawful" offenses.

Second: even if there were an obviously-unlawful exception to *Henderson* (there is not), it is not "obviously unlawful" to drive without a functioning taillight. The regulation itself reveals as much. By its terms, you can drive without a functioning taillight any time during the day. *See* 43 C.F.R. § 8341.1(f)(5) (applying only "[d]uring night hours"). And you can even drive without a functioning taillight during much of the night, too. *See id.* (permitting as much for a "half-hour after sunset" and a "half-hour before sunrise"). You can therefore engage in the conduct innocently. *See United States v. Lizarraga-Lizarraga*, 541 F.2d 826, 828 (9th Cir. 1976) (identifying that specific intent is required for agency-made import offenses in part because "items might be exported or imported innocently"). This offense would therefore keep its specific-intent character even if *Henderson* contained some obviously-unlawful exception.

In fact, even the BLM seems confused about the legality of driving without a taillight. In a BLM bulletin for Moon Rocks posted on Facebook in advance of Memorial Day 2021 (the weekend Mr. Pheasant was detained), the agency specifically blacked out the taillight prohibition (suggesting it was not in effect):

9



Reply Exhibit A. In a follow-on post, the BLM recognized that the original bulletin had caused "confusion" "regarding lights." Given that confusion, the BLM felt obliged to issue a "corrected" version (without the blackout):



*Id.* If an errant highlighter is all it takes to cause "confusion" about conduct's illegality, the conduct is not "obviously illegal." *Id.*

In short, the government has all but conceded that the taillight offense is a specific-intent one. For good reason: *Henderson* resolves the question. The government's attempt in suppression-briefing to twist an obviously-unlawful exception out of that case misconstrues the Ninth Circuit's reasoning and, in any event, would not apply to the taillight issue here even if it were somehow right. This is a specific-intent offense.

And because the alleged taillight violation is a specific-intent offense, officers needed "particularized probable cause" to believe that Mr. Pheasant had "actual knowledge" of his taillights "non-conformity" to detain him as they did. *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1499 (9th Cir. 1996) (concluding the same about a helmet regulation). Put simply: the officers had to have reason to think Mr. Pheasant himself knew his taillight was deficient.

### b. There Was No Sign Mr. Pheasant Knew His Taillight Was Deficient Prior To Detaining Him.

They lacked that. All of Mr. Pheasant's conduct before the detention (and, for that matter, after it) fit someone who had no idea his taillight was out. *See* ECF No. 57 at 10–12 (identifying as much). So officers lacked reasonable suspicion to stop, never mind probable cause to arrest, Mr. Pheasant for the taillight violation.

The government nonetheless insists that officers had reason to believe Mr. Pheasant knew of the deficiency because (1) Ranger Yost had earlier "tried" to tell him his taillight was out; and (2) after he was detained, Mr. Pheasant made "various statements . . . implying that he [wa]s going to reconnect his taillight, and he d[id] just that." ECF No. 64 at 20–21. Neither is enough.

As for the purported pre-detention attempt to tell Mr. Pheasant about the issue, there is no evidence that Mr. Pheasant heard Ranger Yost say anything—let alone comment on the

taillight deficiency. Ranger Yost's report says only that he "tried" to tell Mr. Pheasant about it earlier in the night. Exhibit A at USAO 3, ECF No. 57-1. And bodycam footage of that attempt indicates that it failed. Ranger Yost only referenced the taillight after Mr. Pheasant had ridden off, as well as after Ranger Yost himself had turned around and walked multiple steps back towards his own vehicle. Exhibit D, USAO 18 at 00:16, ECF No. 57-4. There is therefore no sign Mr. Pheasant (by then some distance away) had heard the comment. Officers could not derive probable cause or reasonable suspicion for his detention from this interaction.

Nor can the government bootstrap justification for the detention from Mr. Pheasant's post-detention conduct. Officer conduct must be "justified at its inception"—not with post-hoc revelations. *United States v. I.E.V.*, 705 F.3d 430, 433 (9th Cir. 2012) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)) (identifying as much for stops); *Scott v. Cnty. of San Bernardino*, 903 F.3d 943, 949 (9th Cir. 2018) (same for arrests). Whatever Mr. Pheasant did after the start of the detention is therefore irrelevant.

But even if that conduct were properly considered, Mr. Pheasant's post-detention statements and behavior also reflected someone who had just found out his taillight was out. For apparently the first time that night, he heard that his light was not working. So he fixed it. *E.g.*, Exhibit E, USAO 19 at 2:04–06 (demonstrating light working), 5:33–46 (same), ECF No. 57-5. There is nothing suspicious, let alone potentially criminal, about that.

Thus, officers lacked any basis—no reasonable suspicion, no probable cause—to detain Mr. Pheasant for the taillight violation. That is the only basis the government offers for his detention. The detention was therefore unconstitutional.

C. **Evidence Stemming From That Unconstitutional Detention Should Be Suppressed.**

Finally, the exclusionary rule applies to all post-detention evidence here. The government makes a passing claim that the exclusionary rule would "serve[] no purpose in this case." ECF No. 64 at 21. But the government's argument on the subject is just another claim

that the detention was constitutional. *Id.* (arguing as much because "there was no unlawful conduct"). There is no serious dispute that, should the Court conclude the detention was unlawful, suppression of all evidence collected as a result would be warranted. *Murray v. United States*, 487 U.S. 533, 536 (1988). And as discussed above, the detention was unlawful. So suppression is a proper remedy. *Id.*

Such evidence includes the bodycam footage from the detention, as well any other evidence of Mr. Pheasant's conduct during that time (including any photographs, reports, officer testimony, or portions of them on the subject). The government apparently intends to rely on such materials at trial. But since they resulted from an unlawful detention, they should be suppressed. *Id.*

### III. CONCLUSION

Mr. Pheasant respectfully requests the Court hold an evidentiary hearing and suppress all evidence collected in violation of his Fourth Amendment rights.

DATED this April 14, 2023.

                    RENE L. VALLADARES
                    Federal Public Defender

By: */s/ Sean A. McClelland*
      SEAN A. MCCLELLAND
      Assistant Federal Public Defender
      CHRISTOPHER P. FREY
      Assistant Federal Public Defender

**CERTIFICATE OF ELECTRONIC SERVICE**

I certify that on April 14, 2023, I electronically filed the foregoing with the United States District Court for the District of Nevada by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  The following non-CM/ECF participants will be served by U.S. Mail:  Gregory W. Pheasant.

/s/Katrina Burden
Katrina Burden
Federal Public Defender Employee